Filed 3/13/25  P. v. Moreno CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B328870 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA488780-01) |
| v. | |
| GEORGE MORENO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ray G. Jurado, Judge.  Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Following a jury trial George Moreno was convicted of murdering Omar Nieves and of attempted murder and assault with a semiautomatic firearm on Jorge Arias.  On appeal he contends that sheriff's detectives employed impermissibly suggestive means to obtain an identification by an eyewitness, and that the trial court abused its discretion in not dismissing a prior strike offense before calculating Moreno's sentence.  Finding no error, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. The Murder of Omar Nieves**

On the evening of July 10, 2020, Omar "Guero" Nieves was talking with David Gomez near the corner of Marianna and Augusta Avenues in East Los Angeles.  Nieves lived in a van in a nearby homeless encampment; Gomez in an RV parked at the corner of Marianna and Augusta.  A black Ford Explorer circled the block and stopped near where Nieves stood.  Nieves approached the car and spoke to the driver, who was alone in the vehicle.  It sounded to Gomez as though Nieves and the driver were arguing, and Nieves appeared to be angry.  The Explorer drove off, but returned a few minutes later.  Nieves resumed his argument with the driver.  Gomez saw the driver rack and fire a pistol through the open front passenger window.  After lighting a cigarette and taking a few puffs, Nieves cried out "I've been hit! I've been hit!" before collapsing to the ground.  The Explorer drove swiftly away.

Neighbors gathered at the scene to offer help.  Gomez recognized the shooter and pointed out the house where he lived.  Onlookers called the sheriff's office and an ambulance was summoned.  Nieves was pronounced dead at 9:00 p.m. of a gunshot wound to the abdomen.

2

Investigating detectives began interviewing witnesses, including Gomez. With his consent he was sequestered in the back seat of a patrol car while detectives secured the crime scene. Gomez was interviewed by the detectives, and a sheriff's deputy acted as interpreter. Gomez informed the detectives that he saw the driver of the Explorer and recognized him as someone who lived at a nearby home. Gomez had seen the Explorer driving around the neighborhood. Gomez did not know the driver's name but knew he lived in the garage apartment behind the home in question because he had seen him there washing the car. Gomez described the driver as Hispanic, short, thin and bald.

Later that night Gomez was interviewed a second time by detectives. During this interview detectives showed Gomez a photograph of Moreno. When asked "Do you know that person right there?" Gomez answered, "He is the one who shot." Asked if he was "100 percent sure" of his identification, Gomez answered "Yes. Yes . . . I was – I saw him because I saw him up close." Gomez added that Moreno is "a little older now" than in the photograph, but reiterated he was "100 percent sure" the individual shown in the photograph had shot Nieves that night.

**B. The Shooting of Jorge Arias**

While sheriff's deputies and detectives were arriving at the scene of Nieves's murder, Moreno contacted Jorge Arias, whose wife is Moreno's cousin. At the time of Moreno's trial Arias had known Moreno for 24 years. Moreno told Arias that his car was damaged and had a flat tire. After driving around looking for Moreno, Arias met Moreno at a local market and offered to help him with his car. Instead, Moreno asked Arias to drive to an address in Monterey Park or Alhambra, where Moreno's wife was visiting her brother. When they arrived, Moreno left the car and

3

spoke with his wife while Arias waited.  When Moreno returned to the car, Arias drove while Moreno called friends, looking for a place to stay.  Moreno seemed to be "stressed, anxious and upset."

Eventually Moreno gave up telephoning and he and Arias drove to a liquor store before returning to Arias's house.  The two men sat outside in the side yard while they talked and drank. Moreno told Arias he was "stressed out" and "going through a lot of stuff."  Eventually Moreno asked Arias to drive him to Alhambra to pick up Moreno's wife, but Arias's car only had two seats.  Moreno asked to borrow the car, but Arias refused because he needed it to go to work in the morning. Moreno grew upset, and Arias offered to drive Moreno to his car and help him fix it. Arias drove to where Moreno said he had left his car, but it was not there and the two men could not find it.  Moreno again asked to borrow Arias's car, and "was getting aggressive" when Arias refused.  Finally, Moreno asked Arias to stop and let him out of the car, and while leaving the car asked if Arias had ever been shot before.  When Arias said he had not, Moreno drew a pistol and shot Arias in the right thigh.  Arias had worked as a security guard and recognized Moreno's gun as a nine-millimeter Glock.

After he was shot Arias sped away, leaving Moreno behind. Arias tried to call for help, but the bullet had struck his cell phone.  He also called out for help, without success.  When he arrived at his home, Arias's neighbor was outside and called 911. Arias told the responding officers where he had been shot, and detectives located a nine-millimeter casing, but Arias did not tell them that Moreno had shot him because he was concerned that his wife and family might be in danger.  After his wife persuaded him, Arias contacted the police in late August and identified Moreno as the individual who shot him.

4

### C. Moreno is Arrested in Las Vegas

On August 12, 2020, Moreno was arrested in Las Vegas, where he was living with his wife and children. Sheriff's deputies traveled to Las Vegas that day and interviewed Moreno at the Clark County Correctional Facility. The jury was given a transcript and listened to a recording of that interview. Moreno told the deputies that he used to live on Marianna Avenue at his parents' house, and that he had a black Ford Explorer with the license plate "Geodian." He told deputies he did not drive the Explorer because he did not have a license. He and his wife had moved to Las Vegas because the nearby homeless encampment was the scene of drug dealing and fights, and his family and children no longer felt safe. Moreno denied knowing anyone named Omar Nieves. Shown a photograph of Nieves, Moreno stated "It looks like some guy but I don't know him by his name." Asked about Nieves's murder, Moreno insisted he was innocent and that "it's impossible" his Explorer was in the neighborhood at the time of the shooting. Shown video footage of the black Explorer taken from neighborhood security cameras, Moreno continued to insist the vehicle shown was not his Explorer.

A preliminary hearing was held beginning December 12, 2020. Gomez testified as the first witness for the prosecution. He identified Moreno, who was in court wearing a blue jail uniform. Asked by defense counsel whether detectives had shown him a photo of Moreno, Gomez answered, "I don't know the name of the person. I don't know the name. I just know it by sight." Gomez also testified that Moreno was alone in the Explorer when Nieves was shot and that he saw Moreno "rack" the handgun before shooting Nieves. He reiterated that he knew Moreno by sight but not by name. He also confirmed that he was

5

not shown a photograph of Moreno until the second interview with detectives.  Arias also testified for the prosecution and related the details of his encounter with Moreno leading up to his being shot, as well as details of his injuries.  At the end of the preliminary hearing, Moreno was bound over for trial on the murder, attempted murder and assault charges.

### D. Moreno Unsuccessfully Moves to Exclude Gomez's Identification at Trial

Prior to trial Moreno's counsel filed a motion to exclude Gomez's identification on the ground that it was the product of "impermissibly suggestive" conduct by the investigating detectives.  Moreno argued that Gomez only identified Moreno as the shooter because "everyone is saying [the shooter] is Javier's son," that the detectives coerced Gomez by sequestering him in a patrol car for several hours while securing the crime scene, and that showing Gomez a single photograph of Moreno was so unduly suggestive as to violate Moreno's right to due process. In a supplemental filing prior to the hearing on the motion to exclude, Moreno argued that the identification procedure did not comply with Section 859.7.[1]

In opposition, the prosecution argued that Gomez made a positive identification, that there was nothing inherently suggestive in the single-photograph procedure employed because "all of this conversation and all of these answers took place prior to a photograph ever being shown to the witness, Mr. Gomez," and that regardless of the procedure used, the Gomez's identification of Moreno was sufficiently reliable to be admitted at trial.  Responding to Moreno's argument that Gomez identified him only because others said he was the shooter, the prosecutor

---

[1]      All statutory references are to the Penal Code.

argued that "He didn't know the individual by name. So he couldn't say the person's name. But he, in a very colloquial sense, as they were standing out there says, 'they're saying it's Javier's son.' And he's saying he doesn't know who Javier is. He doesn't know – I mean, he knows who Javier is by sight, I suppose. But he does not know these individuals by name. He just recognizes them from the neighborhood and the house with which they live in." Elsewhere, she argued, "Mr. Gomez is rightfully saying, 'I'm not saying whose son it is . . .' He's correctly trying to say, 'I don't know his name. Like, I don't know Javier. I just know he's the younger guy who lives in that house.'" As for section 859.7, the prosecutor argued that even if it applied, subdivision (d) of the statute provides that "[n]othing in this section is intended to preclude the admissibility of any relevant evidence or to affect the standards governing the admissibility of evidence under the United States Constitution."

The trial judge noted that he spoke Spanish and pointed out instances where Moreno's argument was based on an inaccurate translation of Gomez's statements by a sheriff's deputy on the scene. After lengthy oral argument, the court denied Moreno's motion to suppress, ruling that the procedure used was not so impermissibly suggestive as to deprive Moreno of due process, finding that "the one photograph identification given the totality of the circumstances was fair and that the resulting identification from the photograph and also in court at preliminary hearing was fair, not unduly suggestive."

### E. The Trial and Sentencing

In an amended information, Moreno was charged with murder of Nieves (§ 187, subd. (a); count 1), being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2), attempted

7

willful, deliberate and premeditated murder of Arias (§§ 664, 187, subd. (a); count 3), and assault with a semiautomatic firearm on Arias (§ 245, subd. (b); count 4). The information further alleged that Moreno personally used and discharged a firearm (§ 12022.5, subds. (a) & (d)), that Moreno caused great bodily injury to Arias (§ 12022.7, subd. (a)), and that Moreno suffered prior serious or violent felony convictions (§§ 667, subds. (b)-(i), 1170.12).

By the time of Moreno's trial, Gomez had become a reluctant witness. He told a neighbor that he wanted to evade service in order to avoid having to testify because he felt sorry for Moreno and did not want to add to his troubles. A sheriff's department investigator brought Gomez to court. Called to the stand, Gomez testified he identified Moreno as the shooter only because others in the neighborhood said so. Likewise, he testified he identified Moreno at the preliminary hearing based on what he heard around the neighborhood. The jury heard recordings of Moreno's prior statements identifying Moreno, and they were provided a transcript of his prior statements.

Gomez was not the only witness whose testimony linked Moreno to Nieves's murder. Another neighbor, Eulalia Gamez, testified that prior to the murder she saw Moreno driving his black Explorer, which she recognized by its personalized license plate. Moreno was alone in the vehicle when she saw the SUV stop, heard gunshots and observed a man fall to the ground. The black Explorer drove away and Gamez did not see it return.

Moreno also took the stand and testified in his defense. He told a very different story than what he had related to detectives on the drive back from Las Vegas. Moreno testified that on the night of the murder, he was getting into the Explorer when another car pulled up nearby. A man who was bald,

8

skinny, tattooed and slightly taller than Moreno got out and approached Moreno, brandishing a chrome handgun and asking, "Where you from." Moreno believed this was a challenge from a gang member and responded, "nowhere," indicating he was not from a rival gang. According to Moreno, the man was angry and looking for someone. He told Moreno to get into the Explorer and drive while the gunman hid in the back seat, concealed behind tinted windows. At the gunman's direction, Moreno drove to where Nieves and Gomez were standing. The gunman lowered the back window and spoke with Nieves. Moreno drove away and told the gunman that the police were coming. The gunman instead directed Moreno to go around the block and return to Nieves. This time, the gunman shot Nieves through the open front passenger window. Moreno sped away but when he stopped at a red light, the gunman fled, leaving his gun in the back seat.

After the gunman fled, Moreno testified, he called Arias, uncertain of what to do next. He showed the gun to Arias and told Arias what had happened. The two men drank and Arias used methamphetamine before driving Moreno back to his car. Because both Arias and Moreno were drunk, they could not find Moreno's car, so Moreno asked to be dropped off. The gun was lying on the center console of Arias's car, and when Moreno picked up the gun while leaving the car, the gun discharged accidentally. Arias drove off without Moreno knowing he had been shot. Moreno threw the gun on the roof of a nearby house before leaving the scene. He admitted he had not told this story to the Los Angeles detectives who interviewed him following his arrest in Las Vegas.

The jury found Moreno guilty of first-degree murder of Nieves, of being a felon in possession of a firearm, and of

9

attempted murder of Arias, and of assault with a semiautomatic firearm on Arias.[2] The jury also found true allegations that Moreno personally used and discharged a firearm and inflicted great bodily injury on Arias. Moreno waived a jury trial on prior convictions and aggravating factors allegations. The court found true, in aggravation, that Moreno's crime involved a high degree of cruelty, viciousness or callousness (Cal. Rules of Court, rule 4.421(a)(1)), that Moreno used a weapon in the commission of the crime (*id*., rule 4.421(a)(2)), and that Moreno took advantage of a position of trust or confidence to commit the crime (*id*., rule 4.421(a)(11)). The court found no factors in mitigation.

The prosecution filed a sentencing memo recommending Moreno receive a sentence of 29 years plus 64 years to life in state prison based on, in part, a prior strike offense for assault with a deadly weapon in violation of section 245, subdivision (a)(1). In response, Moreno's counsel filed a memorandum requesting Moreno be sentenced to a term of 25 years to life for the murder of Nieves with the sentences on the other counts running concurrently. Defense counsel calculated the recommended sentence, in part, on the court disregarding Moreno's prior strike as the basis for a sentence enhancement. The trial court declined to dismiss Moreno's prior strike on the ground that doing so was not consistent with public safety.

The court sentenced Moreno as follows: 25 years to life for the murder of Nieves, doubled to 50 years to life, plus 10 years for

---

[2] An amended minute order dated September 12, 2020, prior to Moreno's trial, states that Moreno pleaded no contest to count 4 (§ 245, subd. (b), assault with a semiautomatic firearm) and was found guilty by the court. This discrepancy does not affect the outcome of Moreno's appeal.

10

the firearm enhancement; a consecutive sentence of seven years to life, doubled to 14 years to life, for attempted murder of Arias; for a total of 74 years to life.  The remaining sentences for the other counts were either run concurrent or stayed.[3]

Moreno filed a timely notice of appeal.

## DISCUSSION

### A. Suggestive Identification:  Legal Standard and Standard of Review

"Identification evidence can offend a defendant's due process rights if the identification procedure is unduly suggestive and unnecessary."  (*People v. Mejia* (2024) 104 Cal.App.5th 921, 932.)  A procedure is unfair if it suggests in advance the identity of the person police suspect.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 413 (*Ochoa*).)

"To determine whether the admission of identification evidence violates a defendant's due process rights, the court asks two questions.  First, the court asks whether the identification procedure was unduly suggestive and unnecessary.  [Citation.] 'Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous.'  [Citation.]  Second, even if the lineup was unnecessarily suggestive, the court asks whether the identification was nonetheless reliable under the totality of the circumstances.  [Citation.]"  (*People v. Wilson* (2024) 16 Cal.5th 874, 901.)  Only where circumstances present a

---

[3]     Moreno received a concurrent sentence of three years, doubled to six years, for being a felon in possession of a firearm; and nine years, doubled to 18 years but stayed pursuant to section 654, for assault on Arias.

11

"substantial likelihood of irreparable misidentification" will a reversal be warranted. (*Manson v. Brathwaite* (1977) 432 U.S. 98, 104–107.) "But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." (*Perry v. New Hampshire* (2012) 565 U.S. 228, 232.)

Moreno has the burden to show that the identification procedure used by the deputies was constitutionally impermissible. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.) On appeal, we give deference to " 'the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review[4] the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive.' [Citation.] 'Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 902.) " '[I]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]" (*Ochoa, supra,* 19 Cal.4th at p. 412.)

---

[4] "When courts engage in independent review, they should be mindful that ' "[i]ndependent review is *not* the equivalent of de novo review. . . ." ' [Citation.] An appellate court may not simply second-guess factual findings that are based on the trial court's own observations." (*People v. Vivar* (2021) 11 Cal.5th 510, 527.)

12

**B. Gomez's Identification of Moreno Was Neither Unduly Suggestive nor Unreliable**

"[F]or a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure." (*Ochoa, supra*, 19 Cal.4th at p. 413.)  Here, the identification used by the responding deputies was the opposite of "suggestive."  Gomez "identified" the shooter in all but name before he was shown a photograph[5] of Moreno.  Specifically, Gomez gave a physical description of the individual who shot Nieves, told the officers where the shooter lived and what kind of vehicle he drove, and even distinguished him from a brother who lived at the same address.  Only after receiving this information did the detectives show Gomez Moreno's photograph and ask "Do you know who this individual is right here?," to which  Gomez replied that Moreno was the unnamed individual he had seen shoot Nieves.  By the time he was shown Moreno's photograph, Gomez had "identified" Moreno in all but name.  Showing him Moreno's photograph did not "suggest" anything that Gomez had not already told the detectives.

Our conclusion that the procedure employed here was not unduly suggestive because Gomez identified Moreno before being shown his photograph is consistent with recent cases decided by our Supreme Court under analogous circumstances.  In *Ochoa*, for example, an eyewitness asked to see a profile picture after tentatively identifying a suspect from a photo lineup.  (*Ochoa, supra,* 19 Cal.4th at p. 412.)  In response to that request, police

---

[5]    The photograph itself was a bare photo of Moreno, without any writing or indication that Moreno had a criminal record.

13

showed the witness a profile image of Ochoa, but not of any other individuals whose pictures were in the lineup. After seeing Ochoa's profile the eyewitness confirmed her identification. On appeal, the Supreme Court held that the procedure used was not unfair because it did not suggest the suspect's identity in advance of the witness's identification of the suspect. (*Id.* at p. 413.) More recently, in *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, the Supreme Court found no unfairness where an eyewitness, who tentatively identified a suspect from a photographic lineup, asked to see a different photograph of the suspect and confirmed the identification after being shown a newspaper photo. The procedure did not violate due process because, "[a]s in *Ochoa*, police did not suggest McClain's identity before Pina identified him." (12 Cal.5th at p. 770.)

Moreno also argues that the identification was suggestive because the investigating officers essentially locked Gomez in the back of a patrol car for several hours, during which, Moreno contends, Gomez was intimidated into identifying Moreno as the shooter. This contention, too, does not bear scrutiny. In the first place, nothing in the record supports Moreno's contention that Gomez's identification was compromised by his being sequestered in the back of a patrol car. Moreno's counsel questioned Gomez on this point at the preliminary hearing, asking Gomez whether he was "afraid that they were going to maybe arrest you or do something to you," to which Gomez responded, "No, because the officer who placed me in the car said that they were just doing an investigation." Second, Moreno does not explain what should have been done differently. Assuming Gomez was intimidated by sitting in a patrol car, it is hard to believe he would have found it

14

less intimidating to be transported to a sheriff's station for questioning.  We also see a contradiction in Moreno suggesting that Gomez was influenced by being sequestered in a patrol car, while at the same time arguing that he was influenced by the hue and cry of onlookers insisting that the shooter was "Javier's son."

"Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification." (*People v. Yeoman* (2003) 31 Cal.4th 93, 125.)  Having agreed with the trial court that the procedure used by the investigating officers was not unduly suggestive, we need not address the reliability of Gomez's identification of Moreno.  We note, however, that Gamez also identified Moreno as the sole occupant of the black Explorer at the time Nieves was shot and killed.  More important, by admitting at trial he was driving the Explorer when Nieves was shot, Moreno blunted much of the force of his argument that Gomez's identification was so flawed as to violate due process.  Moreno's admission he was driving the Explorer let the jury choose whether to believe an individual who supposedly looked similar to Moreno forced his way into Moreno's Explorer, concealed himself in the vehicle, shot and killed Nieves without being seen by any bystanders, then escaped the vehicle unobserved while leaving his gun behind.  The prosecutor emphasized this point in her rebuttal closing argument:  "Now, what Mr. Gomez was always certain about, when he talked to the police that night, when he testified at prelim, and when he testified here at trial, that there was one person in that SUV, one.  Only the driver  [¶] . . . [¶]  And there's just been a lot of trying to muddy up the waters for that, which makes a lot of sense when this whole case revolves around Mr. Gomez's

15

testimony as the only witness who saw him pull the trigger. But now the defendant has taken the stand and admitted to you that he was in that driver's seat."

This is not to say that Gomez was an ideal witness for the prosecution. He was not. The inconsistencies between his initial statements and his trial testimony do not, however, establish a violation of Moreno's right to due process. "The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." (*Perry v. New Hampshire, supra,* 565 U.S. at p. 237.) "[E]vidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (*Manson v. Brathwaite, supra,* 432 U.S. at p. 116.) "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." (*Davis v. Alaska* (1974) 415 U.S. 308, 316.) It is undisputed that "[t]he circumstances of the identification were disclosed to the defense [and] they were the subject of thorough cross-examination." (*People v. Alexander, supra*, 49 Cal.4th at p. 903.) The jury determines the credibility of witnesses and the weight to afford their testimony, and Moreno is bound by the jury's decision to credit Gomez's initial statement to investigating officers.

## C. The Trial Court Acted Within its Discretion Not to Dismiss Moreno's Prior Strike

Moreno's final contention on appeal is that the court abused its discretion by not disregarding his prior felony conviction under the three strikes law. The court may strike a prior conviction. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530.) "We review the denial of a motion to dismiss a strike allegation for abuse of discretion." (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1029.)

The People argue that Moreno forfeited this argument by not making a specific request under section 1385, subdivision (a) to dismiss Moreno's prior strike for purposes of the three strikes law, as opposed to arguing in his sentencing memo that it should not be considered as a sentence enhancement under section 1385, subdivision (c).

We decline to find this contention forfeited for three reasons. First, it is clear from the record that the trial court deemed Moreno to have made a request to dismiss his prior strike, denied that request on the merits. For example, during the sentencing hearing the court stated to Moreno's counsel, "Oh, you did argue, Mr. Goalwin, that I should not apply the strike because it's more than five years old, but isn't that also a situation where, if I find that doing so would endanger public safety, I should not do that?" Second, both sides have briefed the issue on the merits, and we see no prejudice to the People by addressing the issue. Third, in our review of the record we cannot see where the prosecutor objected to the court addressing whether to dismiss Moreno's prior strike.

Without endorsing the procedure Moreno followed, we have reviewed the order refusing to dismiss a prior strike, and we find

17

no abuse of discretion.  As our Supreme Court observed in *People v. Carmony* (2004) 33 Cal.4th 367, 377-378, "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.  [¶] . . . [¶] [i]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations."  Moreover, the trial court "is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary."  (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

A trial court abuses its discretion in refusing to dismiss a prior strike only in limited circumstances, such as when it was not aware of its discretion to dismiss, where it considered impermissible factors in refusing to dismiss, or where the resulting sentence leads to an arbitrary, capricious or patently absurd result.  (*People v. Carmony, supra*, 33 Cal.4th 367, 378.)  None of these factors appears on the record.  It is obvious from the quoted language above that the trial court was aware that it had the power to dismiss a strike.  In refusing to dismiss Moreno's prior strike on the ground that doing so would endanger public safety, the court cited Moreno's "callous and cold and cruel actions in shooting at these two victims," which are properly considered in deciding a *Romero* motion.  (See, e.g.*, People v. Brugman* (2021) 62 Cal.App.5th 608, 640 [no abuse of discretion, citing defendant's "continuous history of criminal conduct"] *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1170 [no abuse of discretion although refusal to strike two prior convictions resulted in sentence of 85 years to life]; *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 [reversing dismissal of prior strike where defendant "led a continuous life of crime after the prior"].)

On the record before us, the trial court's decision not to disregard Moreno's prior felony conviction was neither irrational nor arbitrary. To the contrary, in his opening brief Moreno "acknowledges that his prior record raises the inference of accelerating violence," but argues that the trial court should have credited "significant evidence that . . . Moreno has a serious issue with addiction and mental health." Moreno, however, waived a jury trial on aggravating and mitigating factors, and the weighing of evidence of those factors was left to the trial court's discretion. "Generally, where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment of the proper decision for that of the trial judge." (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682.) Moreno's acknowledgement that his record *could* be viewed as one of accelerating violence confirms that the trial court's exercise of discretion was not arbitrary or irrational, but was within the range of outcomes based on the evidence before the court.

## DISPOSITION

The judgment is affirmed.


RICHARDSON, J.

We concur:


LUI, P. J.


ASHMANN-GERST, J.

19